IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

ROMONA L. FLOYD, Individually,      *
as Surviving Parent of Jessica
Ann Ray, deceased, and as           *
Administratrix of the Estate of
Jessica Ann Ray, deceased,          *
                                                        CASE NO. 3:08-CV-122 (CDL)
        Plaintiff,                  *

vs.                                 *

UNITED STATES OF AMERICA,           *

        Defendant.                  *

_____

O R D E R

Plaintiff Romona L. Floyd filed this action against Defendant United States of America for the wrongful death of her daughter, Jessica Ann Ray, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80, ("FTCA"). The Court conducted a non-jury trial on May 17, 18, and 24, 2010. After careful consideration of the evidence and the applicable law, the Court finds that Defendant's agents prescribed Prozac for Jessica Ann Ray when it was not indicated or appropriate. The Court further finds that as a proximate result of ingesting the Prozac, Jessica Ann Ray hanged herself, which resulted in a devastating brain injury that ultimately caused her death. Accordingly, the Court finds in favor of Plaintiff and awards Romona L. Floyd, as surviving parent of Jessica Ann Ray, damages of $2,781,684.20 against the United States for the wrongful death of Jessica Ann Ray and for Jessica Ann Ray's medical expenses while she was a minor. In addition, the Court awards Romona L.

Floyd, as Administratrix of the Estate of Jessica Ann Ray, damages of $678,208.00 against the United States for Jessica Ann Ray's medical expenses after she reached the age of majority, other necessary expenses, and pain and suffering experienced by Jessica Ann Ray from the date of her attempted suicide to the date of her death. The Court's verdict and judgment are based on the following findings of fact and conclusions of law.

FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

1.

On January 26, 2006, Jessica Ann Ray ("Jessica Ray"), who was fifteen years old at the time, visited the MedLink Clinic in Hartwell, Georgia. Two days before, Jessica Ray had been to the hospital emergency room where she was treated for nausea, abdominal pain, and vomiting. The Medlink Clinic visit was to follow-up on the emergency room visit.

2.

At the MedLink Clinic, Jessica Ray was seen by advanced nurse practitioner Myra Bowie ("Nurse Bowie") who worked under the supervision of Dr. Paul Raber ("Dr. Raber"). Both Nurse Bowie and Dr. Raber were employees of the MedLink Clinic. The MedLink Clinic received funding from the United States, and the United States stipulates that it is legally responsible under the FTCA for any

2

medical negligence of Nurse Bowie and Dr. Raber.  The United States further stipulates that Plaintiff has exhausted all of her administrative remedies and that her claims are timely.

3.

During the January 26 visit, Jessica Ray and her mother, Romona Floyd ("Mrs. Floyd"), the Plaintiff in this action, informed Nurse Bowie that Jessica Ray had been experiencing nausea, vomiting, and abdominal pain and had been to the emergency room two days before at approximately 3:00 A.M.  They were told in the emergency room to follow up with a private physician which is why they visited the MedLink Clinic on January 26.  After Nurse Bowie talked with Jessica Ray and her mother, she wrote prescriptions for anti-nausea medication and for Prozac on a prescription pad that had been pre-signed by Dr. Raber.  In her notes for that visit, Nurse Bowie wrote "depression–Prozac."  Her notes contain nothing to indicate that she conducted any type of clinical evaluation to determine whether Jessica Ray satisfied the criteria for a diagnosis of depression. Although Nurse Bowie testified that she conducted such an evaluation, the Court finds that her testimony was not credible in light of the following facts: (1) nothing was noted in the medical record to indicate that such an evaluation was done; (2) the standard of care required that a notation be made if such an evaluation was done; (3) Nurse Bowie made an addendum several weeks later to include such a notation in the record after a subpoena was issued for Jessica Ray's

3

medical records; and (4) Jessica Ray lacked significant signs that she was suffering from depression. The Court also finds that Nurse Bowie's testimony regarding the evaluation was not credible due to the self-serving nature of Nurse Bowie's testimony at trial and the Court's evaluation of Nurse Bowie's demeanor. Therefore, the Court finds as a factual matter that Jessica Ray did not exhibit signs of clinical depression during Nurse Bowie's examination of her on January 26 and that Nurse Bowie did not perform an examination to determine whether Jessica Ray qualified for the diagnosis of depression.

4.

The Court further finds as a factual matter that Nurse Bowie wrote the prescription for Prozac on a prescription pad that had been pre-signed by Dr. Raber. The Court also finds that Nurse Bowie did not discuss with Dr. Raber whether the Prozac prescription or the depression diagnosis was appropriate for Jessica Ray before she gave the prescription to Jessica Ray. The Court makes this factual finding notwithstanding testimony by Nurse Bowie and Dr. Raber to the contrary. Their testimony was not credible on this issue. Both Nurse Bowie and Dr. Raber had an incentive not to tell the truth regarding this matter, particularly given the fact that they both were under indictment for violating Georgia law relating to the unauthorized prescribing of medication. At the time Nurse Bowie wrote Jessica Ray's prescription, under Georgia law, a nurse

4

practitioner was not authorized to prescribe medication. O.C.G.A. § 43-34-26.1 (2006). Furthermore, medical doctors were not authorized to pre-sign prescriptions in blank. O.C.G.A. § 16-13-41(h); *see Raber v. State*, 285 Ga. 251, 251, 254-55, 674 S.E.2d 884, 885, 887 (2009) (denying Dr. Paul Raber's constitutional due process challenge to O.C.G.A. § 16-13-41(h)). Both Nurse Bowie and Dr. Raber invoked their rights under the Fifth Amendment to the United States Constitution and refused to answer significant and material questions during the trial. Both witnesses' demeanor and the nature of their testimony were considered by the Court in assessing their credibility.

5.

At the conclusion of the January 26 visit, Nurse Bowie informed Jessica Ray and her mother that Jessica Ray should return for a follow-up appointment in one month. Nurse Bowie did not inform Jessica Ray or her mother that they needed to come back any sooner, and she did not inform them of any special precautions they should take regarding the Prozac.

6.

In 2004, before Nurse Bowie prescribed the Prozac for Jessica Ray, the United States Food and Drug Administration (the "FDA") issued a "black-box warning" regarding Prozac (the "Black-Box Warning"). That warning was as follows:

> Suicidality in Children and Adolescents—Antidepressants increased the risk of suicidal thinking and behavior

(suicidality) in short-term studies in children and adolescents with major depressive disorder (MDD) and other psychiatric disorders. Anyone considering the use of Prozac or any other antidepressant in a child or adolescent must balance this risk with the clinical need. Patients who are started on therapy should be observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber. Prozac is approved for use in pediatric patients with MDD and obsessive compulsive disorder (OCD). (*See* WARNINGS and PRECAUTIONS, Pediatric use.)

Pooled analyses of short-term (4 to 16 weeks) placebo-controlled trials of 9 antidepressant drugs (SSRIs and others) in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders (a total of 24 trials involving over 4400 patients) have revealed a greater risk of adverse events representing suicidal thinking or behavior (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. No suicides occurred in these trials.

Trial Ex. P-1(C), Physicians' Desk Reference 1771-72 (2006) [hereinafter PDR].

The FDA also warned that:

All pediatric patients being treated with antidepressants for any indication should be observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases. Such observation would generally include at least weekly face-to-face contact with patients or their family members or caregivers during the first 4 weeks of treatment; then every other week visits for the next 4 weeks, then at 12 weeks, and as clinically indicated beyond 12 weeks. Additional contact by telephone may be appropriate between face-to-face visits.

*Id.* at 1774.

Nurse Bowie ignored these warnings and did not inform Jessica Ray or her mother of these increased risks. Nurse Bowie also failed to closely observe Jessica Ray during the initial weeks of her Prozac therapy. Instead, Nurse Bowie told Jessica Ray and her mother to return for a follow-up visit in one month.

7.

On February 18, 2006, twenty-three days after being prescribed Prozac, Jessica Ray hanged herself by securing a belt around her neck and connecting it to the pole that held her clothes in her bedroom closet. As a result of the hanging, Jessica Ray suffered a catastrophic brain injury caused by a lack of oxygen, but she did not die immediately. Jessica Ray survived for three years and forty-seven days and died on April 6, 2009.

8.

After the hanging, Jessica Ray was 100% disabled. She required constant care, twenty-four hours a day, seven days a week, for the rest of her life. She was completely dependent upon others to attend to her basic needs. She was confined to her bed and a wheelchair. She could not talk. She needed a feeding tube for her nourishment. She had extremely limited mobility in all of her extremities and could do nothing for herself. However, Jessica Ray was aware of her surroundings and could sense pain and discomfort. She experienced significant suffering and limitation during the last three years of her life.

9.

On April 6, 2009, Jessica Ray finally died from complications due to her immobility and her devastating brain injury.

10.

Prior to January 26, 2006, Jessica Ray was a typical teenage girl. She had been a motivated and active child her entire life, getting good grades in school, participating in extracurricular activities, socializing with many friends, and exhibiting a positive zest for life. Although she had mood swings related in part to disputes with her family, the Court finds no evidence that those mood swings were significant or that they substantially interfered with her daily activities. As discussed in more detail below, Defendant contends that certain stressors, including an argument between Jessica Ray and her father and Jessica Ray's break-up with her boyfriend, were the sole cause of Jessica Ray's suicide attempt. The Court finds it preposterous to suggest that Jessica Ray's father's comment that talking to Jessica Ray was "like talking to a stop sign" had anything to do with Jessica Ray's decision to wrap a belt around her neck and kill herself in such a gruesome and painful manner. The Court also finds that the break-up of Jessica Ray's relationship with her boyfriend days before her suicide attempt was not likely a substantial cause of her attempt. Jessica Ray had dated other boys, and, in fact, had been out on a date with someone else the night

before her suicide attempt. Furthermore, Jessica Ray and her former boyfriend continued to communicate, and nothing indicated that there was no hope for reconciliation. Simply put, the Court finds no credible evidence exists that Jessica Ray's personality or outlook on life or the events preceding her suicide attempt were such that, standing alone, they would have caused her to attempt to take her life in such a violent manner.

11.

The Court finds that Nurse Bowie deviated from the standard of care, as defined in the Court's conclusions of law, in the following ways:

a) by diagnosing Jessica Ray with depression on January 26, 2006;

b) by failing to conduct a complete psychological evaluation prior to prescribing Prozac, and by failing to document any of the psychological findings from her January 26, 2006 evaluation of Jessica Ray;

c) by failing to order psychological counseling for Jessica Ray prior to prescribing Prozac;

d) by prescribing Prozac for Jessica Ray when she did not exhibit signs of clinical depression;

e) by prescribing Prozac using a pre-signed prescription pad without any consultation with a medical doctor;

f)  by failing to discuss the Black-Box Warning for Prozac with Jessica Ray and her mother; and

g)  by informing Jessica Ray and her mother that Jessica Ray needed to come back for a follow-up visit no sooner than one month following the January 26 visit.

The Court's findings of these deviations from the applicable standard of care are supported by the opinions of Plaintiff's experts, who testified at trial, and in large degree by Defendant's own nurse expert who testified at trial.

## 12.

The Court finds that these deviations from the standard of care were a substantial contributing cause of Jessica Ray's attempted suicide on February 18, 2006.

## 13.

The Court finds that Jessica Ray took the Prozac as prescribed by Nurse Bowie.  The Court further finds that if she had not taken the Prozac, it is more likely than not to a reasonable degree of medical certainty that Jessica Ray would not have tried to kill herself as she did on February 18, 2006.  The Court bases its factual findings regarding causation on the following:

As to general causation, the Court finds that the expert testimony of Dr. Edwin Johnstone, the various studies admitted into evidence, and the FDA's Black-Box Warning for Prozac demonstrate that Prozac is capable of causing chemical imbalances in the brains of

certain adolescents under certain circumstances that would cause that person to take her own life when she would not do so if she were not influenced by the medication.[1]   Thus, the Court finds that the evidence demonstrates general causation.

As to specific causation, the Court is persuaded, based on Dr. Johnstone's testimony and the other evidence, that Prozac was a substantial contributing cause of Jessica Ray's suicide attempt. Jessica Ray should not have been prescribed Prozac in the first place. Thus, she was given the medication when it was not indicated. Furthermore, no significant stressors existed sufficient to support any finding that they were the sole cause of Jessica Ray's suicide attempt.   The only stressors relied upon by Defendant are Jessica Ray's break-up with her boyfriend, an argument between Jessica Ray and her father, her mother's observations that she had been moody, speculation that Jessica Ray was involved in the "Goth culture," and speculation that Jessica Ray had an argument with her mother.

First, there was no credible evidence that Jessica Ray was involved in the Goth culture.   A few black t-shirts found in a teenager's closet don't qualify.   Defendant's suggestion that Jessica Ray was involved in Goth culture was pure speculation.   Second, Jessica Ray's moodiness does not support a conclusion that she was so psychologically troubled that she would take her own life.   The Court

---

[1]As explained below, the Court finds Dr. Johnstone's testimony on general and specific causation admissible under Federal Rule of Evidence 702.

finds this suggestion speculative and not credible given that many teenagers are moody, and there was no evidence that Jessica's mood swings were out of the ordinary. Third, the Court finds that there was no credible evidence that the argument between Jessica Ray and her father was out of the ordinary or unusual. Jessica Ray did not want to talk while she and her father were riding in the car to McDonald's, and he commented that talking to her was like talking to a stop sign. There was no indication that he did not love her, that there was going to be a significant change in their relationship, that he was punishing her, or that he was ridiculing her in some extreme way. It is an act of desperation on Defendant's part to suggest that this episode substantially contributed to Jessica Ray's suicide attempt. Finally, the Court finds that there was no credible evidence that any argument which may have occurred between Jessica Ray and her mother on the day of Jessica Ray's suicide attempt was out of the ordinary or unusual.

Recognizing that the foregoing explanations for Jessica Ray's suicide attempt are extraordinarily weak, Defendant focuses on Jessica Ray's break-up with her boyfriend. The Court finds that while the break-up may have been a contributing cause of Jessica Ray's suicide attempt, it was not the sole or even a substantial contributing cause. The break-up did not have absolute finality; there was hope for reconciliation. Jessica Ray and her former boyfriend continued to communicate. Although Jessica Ray was sad

about the break-up, she was moving on and even had another date the day before her suicide attempt. The evidence also shows that neither Jessica Ray nor her former boyfriend had made any long-term commitments to each other. They were fifteen-year-olds who were dating. The evidence demonstrates that Jessica Ray was not isolated. Although she had spent substantial time with her former boyfriend, she had many other friends and had only been dating him for six months. Based on these circumstances, the Court concludes that the break-up was not a substantial contributing cause of Jessica Ray's suicide attempt. In finding that the Prozac was a substantial contributing cause, the Court notes that the nature of Jessica Ray's suicide attempt indicates that certain imbalances in her brain likely caused her to act with extreme impulsivity and violence that is atypical for a girl who seeks to end her life because she was jilted by her boyfriend.

14.

For all of these reasons, the Court finds by a preponderance of the evidence that Prozac was a substantial contributing cause of Jessica Ray's suicide attempt. The Court further finds that Nurse Bowie's deviations from the standard of care proximately caused Jessica Ray to ingest the Prozac which caused the imbalances in her brain that substantially contributed to her suicide attempt. Therefore, the Court finds that Jessica Ray died as a proximate result of Nurse Bowie's deviations from the standard of care.

13

15.

As a proximate result of her injuries, Jessica Ray incurred medical bills in the amount of $474,972.20. The Court finds that these bills were reasonable and necessary, and that they were proximately caused by Nurse Bowie's deviations from the standard of care. Medical bills in the amount of $306,287.20 were incurred while Jessica Ray was a minor and are thus recoverable by Mrs. Floyd as the surviving mother. Medical bills in the amount of $168,685.00 were incurred after Jessica Ray reached majority, and are thus recoverable by Mrs. Floyd, as Administratrix of Jessica Ray's estate.

16.

The Court finds that Jessica Ray's reasonable and necessary funeral and burial expenses were $9,523.00. These expenses were proximately caused by Nurse Bowie's deviation from the standard of care.

17.

The Court finds that Jessica Ray endured significant pain and suffering during the three years and forty-seven days that she lived after her suicide attempt. She was trapped in her body, completely disabled, yet aware of her surroundings and able to sense pain and discomfort. Placing a monetary value on such pain and suffering is difficult, but the Court finds in its enlightened conscience that reasonable compensation for the pain and suffering experienced by

Jessica Ray from the date of her attempted suicide to the date of her death is $500,000.00.

18.

The Court finds that Jessica Ray was on track to attend a four-year college and then work until age 65. Accordingly, the Court finds that a reasonable economic value for her life is $1,475,397.00. As to the intangible value, the Court finds that reasonable compensation is an additional $1,000,000.00.

CONCLUSIONS OF LAW

The Court applied the following legal principles in arriving at its decision in this case:

1.

"Liability in an FTCA action is determined in accordance with the law of the place where the government's act or omission occurred, which in this case is" Georgia. *Stevens v. Battelle Mem'l Inst.*, 488 F.3d 896, 899 n.3 (11th Cir. 2007). The Plaintiff has the burden of proof, which requires that she prove her claims by a preponderance of the evidence. O.C.G.A. § 24-4-3; *Zwiren v. Thompson*, 276 Ga. 498, 499, 578 S.E.2d 862, 864 (2003). "Preponderance of the evidence" means "that superior weight of evidence upon the issues involved, which, while not enough to free the mind wholly from a reasonable doubt, is yet sufficient to incline a reasonable and impartial mind to one side of the issue rather than to the other." O.C.G.A. § 24-1-1(5). "The standard requires only that the finder of

15

fact be inclined by the evidence toward one side or the other." *Zwiren*, 276 Ga. at 499, 578 S.E.2d at 864 (internal quotation marks omitted).

2.

Under § 330 of the Public Health Service Act, the federal government provides support for community health centers in medically underserved communities. Public Health Service Act, Ch. 373, Title III, § 330, as added by Health Centers Consolidation Act of 1996, Pub. L. No. 104-299, 110 Stat. 3626, 3626-44 (codified as amended at 42 U.S.C. § 254b). As part of this support, Congress extended medical malpractice coverage to these entities under the FTCA through enactment of the Federally Supported Health Centers Assistance Acts of 1992 and 1995, which allow the United States to "deem" health centers receiving federal funds under § 330 and their employees to be "employees" of the federal government and therefore covered for medical malpractice purposes by the FTCA. Federally Supported Health Centers Assistance Act of 1992, Pub. L. No. 102-501, 106 Stat. 3268, 3268-72 & Federally Supported Health Centers Assistance Act of 1995, Pub. L. No. 104-73, 109 Stat. 777, 777-83 (codified as amended at 42 U.S.C. § 233); *see* 42 U.S.C. § 233(g)-(n).

Defendant admits that the MedLink Clinic in Hartwell was at all times relevant to this action deemed a federally supported health center under 42 U.S.C. § 233(g)-(n). Def.'s Answer to Pl.'s Am. Compl. ¶ 4, ECF No. 20. Defendant also admits that Nurse Bowie and

16

Dr. Raber were both deemed employees of the Public Health Service and were acting within the scope of their employment when each rendered care to Jessica Ray. *Id.* ¶¶ 5, 7. Consequently, the United States is legally responsible for any of the claims asserted by Plaintiff. 42 U.S.C. § 233(g). The United States is liable "in the same manner and to the same extent as a private individual under like circumstances" after applying Georgia law. *See Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1203 (11th Cir. 2008) (quoting 28 U.S.C. § 2674).

3.

Under O.C.G.A. § 51-1-27, medical professionals, such as Nurse Bowie and Dr. Raber, "must bring to the exercise of his [or her] profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." O.C.G.A. § 51-1-27. "Three essential elements to establish liability in a medical malpractice action have emerged from the statute: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren*, 276 Ga. at 499, 578 S.E.2d at 864 (internal quotation marks omitted).

4.

"[T]he standard to be used to establish professional medical negligence under O.C.G.A. § 51-1-27 is that standard of care which,

17

under similar conditions and like circumstances, is ordinarily employed by the medical profession generally." *McDaniel v. Hendrix*, 260 Ga. 857, 859, 401 S.E.2d 260, 262 (1991) (internal quotation marks omitted); *see Sagon v. Peachtree Cardiovascular & Thoracic Surgeons, P.A.*, 297 Ga. App. 379, 381-82, 677 S.E.2d 351, 354 (2009) (finding that standard of care applies both to doctors and nurses).

5.

To recover for medical malpractice, the plaintiff must establish by a preponderance of the evidence that the defendant's negligence either proximately caused or contributed to cause the plaintiff's harm. *Zwiren*, 276 Ga. at 500, 578 S.E.2d at 864. "Proximate cause is that which in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Id.*, 578 S.E.2d at 865 (internal quotation marks omitted). The defendant's negligence "need not be the sole proximate cause of the death [or injury], but only need contribute." *Bell v. Sigal*, 254 Ga. 78, 80, 326 S.E.2d 730, 732 (1985).

6.

"In order to establish proximate cause by a preponderance of the evidence in a medical malpractice action, the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." *Zwiren*, 276 Ga. at 500, 578 S.E.2d at 865. "An expert's

opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility. It must be based on reasonable medical probability or reasonable medical certainty." *Id*. at 503-04, 578 S.E.2d at 867.

In this case, both parties offered expert testimony from highly qualified psychiatrists on the cause of Jessica Ray's suicide attempt. Plaintiff offered Dr. Edwin Johnstone, M.D., and Defendant offered Dr. Richard Elliott, M.D., Ph.D. Both parties also filed *Daubert* motions seeking to exclude the testimony of their opponent's expert witness. Pl.'s Mot. to Exclude Test. of Richard Elliott, ECF No. 23 [hereinafter Pl.'s Mot. to Exclude]; Def.'s Mot. to Exclude Test. of Edwin Johnstone, ECF No. 25 [hereinafter Def.'s Mot. to Exclude]. Because this FTCA action was tried without a jury, the Court allowed both experts to testify fully concerning their opinions and deferred consideration of each party's *Daubert* motion until after the trial. For the following reasons, the Court now denies each party's *Daubert* motion.

7.

Federal Rule of Evidence 702 governs the admission of expert testimony in federal court, and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The trial court must act as a gatekeeper to ensure the reliability and relevancy of expert testimony; for an expert's testimony to be admitted, the proffered expert must be qualified to render a reliable opinion based on sufficient facts or data and the application of accepted methodologies. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The trial court must "'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

In determining the admissibility of expert testimony under Rule 702, the Court must engage in a "rigorous three-part inquiry" assessing whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th

20

Cir. 2004) (en banc)). "The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong." *Hendrix*, 609 F.3d at 1194. A district court "may not exclude an expert because it believes one expert is more persuasive than another expert." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

Rule 702 provides that a witness may be qualified as an expert by virtue of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Accordingly, in determining whether a proffered expert is "qualified" to offer an opinion, courts generally look to evidence of the witness's education and experience and ask whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise. *E.g., Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). It is beyond dispute that experience in a field may provide a sufficient foundation for expert testimony. *Frazier*, 387 F.3d at 1260-61.

To ascertain whether proposed expert testimony is "reliable," courts consider several factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Kilpatrick*, 613 F.3d at 1335 (citing *Daubert*, 509 U.S. at 593-94). "This list, however, is not exhaustive, and district courts have substantial

discretion in deciding how to test an expert's reliability."[2] *Hendrix*, 609 F.3d at 1194 (internal quotation marks omitted). The Court must conduct "'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Kilpatrick*, 613 F.3d at 1335 (quoting *Daubert*, 509 U.S. at 593-94). The district court's primary focus should be "'solely on principles and methodology, not on the conclusions that they generate.'" *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 595).

## I. Defendant's Motion to Exclude Dr. Johnstone

Dr. Edwin Johnstone opined that there is a "causal link between the ingestion of SSRIs in pediatric and adolescent patients and

---

[2]Additional factors the Court may consider include:

(1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3) Whether the expert has adequately accounted for obvious alternative explanations;

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee notes (2000 amends.) (internal quotation marks and citations omitted).

suicidal thoughts and actions (suicidality)." Johnstone Aff. ¶ 7, ECF No. 40. Dr. Johnstone also concluded, to a reasonable degree of medical certainty, that Jessica Ray's ingestion of Prozac caused or contributed to cause her suicide attempt. *Id.* ¶ 12. Defendant contends that Dr. Johnstone is not qualified to testify and that his opinions are not reliable. Def.'s Mot. to Exclude 12-19. Because the Court finds that Dr. Johnstone is sufficiently qualified and that his causation opinions are based on a reliable methodology, Defendant's motion to exclude is denied as more fully explained below.

A.    Dr. Johnstone's Qualifications

The Court finds that Dr. Johnstone is qualified to render an opinion on the cause of Jessica Ray's suicide attempt. Dr. Johnstone is a board-certified psychiatrist who has had a private clinical practice for forty-one years. Johnstone Aff. ¶¶ 1-2. Dr. Johnstone's clinical experience includes prescribing Prozac and other selective serotonin reuptake inhibitors ("SSRIs") to numerous patients. *Id.* ¶ 2. Dr. Johnstone has had the opportunity to observe the impact of Prozac on patients. *Id.* ¶ 3. Dr. Johnstone has also conducted numerous phase-III clinical trials of experimental antidepressant, antianxiety, and antipsychotic medications, including Zoloft, Paxil, and Luvox, which, like Prozac, are SSRIs. *Id.* ¶¶ 1-2. In addition to his clinical practice, Dr. Johnstone was director of the psychiatry residency program at the Texas Research Institute of Mental Sciences from 1977 to 1984. *Id.* ¶ 4  In that role, Dr. Johnstone taught and

23

gave lectures on suicide. *Id.* Finally, this is not the first time Dr. Johnstone has opined on the link between Prozac and suicide; he has provided such testimony in fifteen previous cases. *Id.* ¶ 5. In two of those cases, Dr. Johnstone was expressly permitted to testify on suicide causality after *Daubert* challenges. *Id.; see also* Pl.'s Mem. in Opp'n to Def.'s Mot. to Exclude Dr. Johnstone Ex. D, Op. & Order of Court 2, 5-7, *Cassidy v. Eli Lilly Co.*, Civil Action No. 821 (W.D. Pa. 2002), ECF No. 39-5. Defendant points out that Dr. Johnstone was excluded from testifying that Zoloft caused an adult's suicide in *Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118 (D. Ariz. 2001). However, unlike this case, *Cloud*: (1) involved an adult, not an adolescent; (2) was decided in 2001, prior to the FDA's 2004 Black-Box Warning; (3) involved a completed suicide, not a suicide attempt; and (4) was a product liability and negligence action against Zoloft's manufacturer, not a medical malpractice action against a health care provider. *Cloud*, 198 F. Supp. 2d at 1121. The Court finds that Dr. Johnstone's exclusion in *Cloud* does not render him unqualified to testify in this case.

Defendant also contends that Dr. Johnstone is not qualified because he is not a suicidologist, psychopharmacologist, epidemiologist, statistician, or an expert on FDA regulations. Def.'s Mot. to Exclude 13. However, a physician, or psychiatrist, need not be a specialist in a particular field in order to qualify as an expert. *See McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004)

24

("The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline."). Rather, Dr. Johnstone's lack of particularized expertise goes to the *weight* accorded his testimony, not the *admissibility* of his opinion as an expert. *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). For purposes of determining admissibility, the issue is whether the expert has the relevant "knowledge, skill, experience, training, or education" to assist the factfinder in determining a fact in issue. Fed. R. Evid. 702; *see also McDowell*, 392 F.3d at 1297 ("An expert . . . is one who qualifies as such by reason of special knowledge and experience, whether or not he is authorized to practice in his special field under licensing requirement[s] imposed by statute.") (internal quotation marks omitted). Though he is not a suicidologist, psychopharmacologist, epidemiologist, statistician, or an expert on FDA regulations, Dr. Johnstone is a board-certified psychiatrist with over forty years of experience and he has significant education and training on the topic of suicide. Dr. Johnstone also has experience conducting clinical trials of SSRIs, treating patients with Prozac, and observing the effect that Prozac has on patients. Therefore, the Court finds that Dr. Johnstone's credentials and experience amply qualify him to testify concerning the cause of Jessica Ray's suicide. *See Frazier*, 387 F.3d at 1260-61 (noting that experience in a field may provide a sufficient foundation for expert testimony).

B.  Dr. Johnstone's Methodology Is Reliable

Dr. Johnstone primarily relies on the differential etiology method to link Jessica Ray's ingestion of Prozac to her suicide attempt.[3] "Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix*, 609 F.3d at 1195. When based on proper scientific groundwork, differential etiology is considered a valid methodology for determining the cause of a plaintiff's injury. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005). "The reliability of the method must be judged by considering the reasonableness of applying the differential etiology approach to the facts of this case and the validity of the expert['s] particular method of analyzing the data and drawing conclusions therefrom." *Hendrix*, 609 F.3d at 1195.

---

[3]Dr. Johnstone described his methodology as a "psychological autopsy" which he explained is a postmortem differential diagnosis. Although the parties and other cases use the term "differential diagnosis," this Court will follow the Eleventh Circuit's direction to use the more precise term "differential etiology." *Hendrix*, 609 F.3d at 1194 n.5. "Differential diagnosis involves the determination of which one of two or more diseases or conditions a patient is suffering from, by systemically comparing and contrasting their clinical findings." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005) (internal quotation marks omitted). A differential diagnosis leads to a "diagnosis of the patient's condition." *Id.* Differential etiology describes "the investigation and reasoning that leads to the determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination." *Id.* (internal quotation marks omitted). It is undisputed Jessica Ray attempted suicide; it is the cause of her attempt that is at issue. Therefore, "the relevant methodology used in this case is differential etiology, i.e., the process of determining which of two or more causes is responsible for the patient's symptoms." *Hendrix*, 609 F.3d at 1195 n.5.

"A reliable differential etiology analysis is performed in two steps. First, the expert must compile a 'comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration . . . . The issue at this point in the process is which of the competing causes are *generally* capable of causing the patient's symptoms.'" *Id.* at 1195 (quoting *McClain*, 401 F.3d at 1253) (alteration in original). "Second, the expert must eliminate all causes but one." *Id.*

"With regard to the first step, the district court must ensure that, for each possible cause the expert 'rules in' at the first stage of the analysis, the expert's opinion on general causation is derived from scientifically valid methodology." *Id.* (internal quotation marks omitted). "This is because 'a fundamental assumption underlying [differential etiology] is that the final, suspected 'cause' . . . must actually be capable of causing the injury.'" *Id.* (quoting *McClain*, 401 F.3d at 1253) (alterations in original). "In the second step of the differential etiology analysis, the expert must eliminate all causes but one." *Id.* at 1197. "While the first step focuses on general causation, in the second step the expert applies the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms, *i.e.*, to determine specific causation." *Id.*

      1.   *Dr. Johnstone's General Causation Opinion Is Reliable*

Dr. Johnstone's general causation opinion is that there is a "causal link between the ingestion of SSRIs in pediatric and adolescent patients and suicidal thoughts and actions (suicidality)."[4] Johnstone Aff. ¶ 7. In reaching his conclusions on general causation in this case, Dr. Johnstone did not personally conduct any independent research. Instead, Dr. Johnstone bases his general causation opinion on: (1) his opinion's general acceptance in the medical and psychiatric community; (2) the FDA's 2004 study of antidepressant-induced adolescent suicidality and the resulting Black-Box Warning; and (3) numerous epidemiological studies and peer-reviewed journal articles. For the following reasons, the Court find's Dr. Johnstone's methodology in forming his general causation opinion reliable under the *Daubert* framework.

a. GENERAL ACCEPTANCE IN THE MEDICAL COMMUNITY

Dr. Johnstone testified, consistent with his affidavit, that "there is a generally-accepted, well-recognized causal link between the ingestion of SSRIs in pediatric and adolescent patients and suicidal thoughts and actions (suicidality)." Johnstone Aff. ¶ 7. Defendant's expert, Dr. Elliott, appeared to agree with Dr. Johnstone that there is a "general consensus" in the psychiatric and general

_____

[4]At trial, Defendant and its expert placed great emphasis on the difference between suicidality and suicide. In this Order the Court uses the term "suicidality," as the FDA's Black-Box Warning does, to mean suicidal thinking and behavior. PDR 1771-72. Suicide attempt is one category of suicidality. Pl.'s Reply in Supp. of Mot. Pl.'s Mot. to Exclude Test. of Dr. Elliott Ex. 1, Tarek A. Hammad, et al., *Suicidality in Pediatric Patients Treated With Antidepressant Drugs*, 63 Archives of Gen. Psychiatry 332, 332-33 (2006), ECF No. 48-2.

medical community that, relative to patients given a placebo, SSRIs can cause increased incidences of suicidality in adolescents. Elliott Dep. 50:10-53:17, Oct. 16, 2009, ECF No. 47. Therefore, the Court finds that the apparent general acceptance of Dr. Johnstone's general causation opinion in the medical and psychiatric community is highly supportive of its reliability. *See Daubert*, 509 U.S. at 594 (noting that general acceptance "can be an important factor" in determining reliability); *accord McLain*, 401 F.3d at 1239. As Plaintiff acknowledges, however, prior to the FDA's 2004 Black-Box Warning, the causal relationship between antidepressants and adolescent suicidality was a controversial topic in the medical community. Pl.'s Mem. in Opp'n to Def.'s Mot. to Exclude Dr. Johnstone 2, ECF No. 39. Therefore, the Court does not rely solely on "general acceptance" as the basis for its finding that Dr. Johnstone's opinion is reliable. *Cf. Hendrix*, 609 F.3d at 1202 n.13 (requiring more than an expert's assertion of general acceptance in the scientific community to establish reliability).

        b.    THE FDA's 2004 STUDY AND BLACK-BOX WARNING

    Dr. Johnstone also pointed to the FDA's 2004 study of antidepressant-induced adolescent suicidality (the "2004 FDA Study") to support his general causation opinion. Johnstone Aff. ¶ 7. In 2004, the FDA charged several of its advisory committees with "examining the occurrence of suicidality (suicidal thinking, behavior, or attempts) in clinical trials that investigate the use of the newer

29

antidepressant drugs [including Prozac] in pediatric patients." Trial Ex. P-4, Laurel K. Leslie, MD *et al.*, *The Food and Drug Administration's Deliberations on Antidepressant Use in Pediatric Patients*, 116 Pediatrics 195, 195 (2005) [hereinafter FDA Deliberations]. As part of its examination, the FDA conducted a meta-analysis of pooled data from twenty-four randomized placebo-controlled pediatric trials including over 4400 patients.[5] Pl.'s Reply in Supp. of Pl.'s Mot. to Exclude Test. of Dr. Elliott Ex. 2, Kelly Posner, Ph.D. *et al.*, *Columbia Classification Algorithm of Suicide Assessment (C-CASA): Classification of Suicidal Events in the FDA's Pediatric Suicidal Risk Analysis of Antidepressants*, 164 Am. J. Psychiatry 1035, 1035, 1038 (2007), ECF No. 48-3 [hereinafter Posner Article]; Pl.'s Reply in Supp. of Pl.'s Mot. to Exclude Test. of Dr. Elliott Ex. 1, Tarek A. Hammad, et al., *Suicidality in Pediatric Patients Treated With Antidepressant Drugs*, 63 Archives of Gen. Psychiatry 332, 332-33 (2006), ECF No. 48-2 [hereinafter Hammad Article]. To increase the reliability of its analysis, the FDA commissioned suicide experts at Columbia University to examine and reclassify the data (the "Columbia Reclassification"). Posner Article at 1035-36; Hammad Article at 333. The FDA defined suicidality as falling into three categories: suicide

---

[5]"Meta-analysis is a method of pooling study results to arrive at a single figure to represent the totality of the studies reviewed. It is a way of systematizing the time-honored approach of reviewing the literature, which is characteristic of science, and placing it in a standardized framework with quantitative methods for estimating risk." Michael D. Green *et al.*, *Reference Guide on Epidemiology, in* Reference Manual on Scientific Evidence 333, 380 (2d ed. 2000).

attempt, preparatory actions toward imminent suicidal behavior, and suicidal ideation. Hammad Article at 333. Those three categories "most clearly represented instances of suicidality and were identified a priori to be used as the primary outcome 'suicidal behavior or ideation.'" *Id.* at 333. After the Columbia Reclassification, the pooled data revealed that the rate of suicidality among youth given antidepressants was 2.19 times greater than youths given a placebo. FDA Deliberations 199. Based on this study, the FDA advisory committees concluded that "there was an increased risk for suicidality causally related to use of the SSRIs and related antidepressants." FDA Deliberations 200. Based on this conclusion, the FDA advisory committees recommended applying the Black-Box Warning to SSRIs and other antidepressants, including Prozac. *Id.* The FDA subsequently issued the Black-Box Warning for Prozac.

The FDA's 2004 Study and Black-Box Warning demonstrate that Dr. Johnstone's general causation opinion can be and has been tested and that it has been subject to peer-review and publication. Furthermore, the study and warning are also evidence that Dr. Johnstone's general causation opinion is generally accepted in the psychiatric and medical community. Therefore, the Court finds the FDA's 2004 Study and Black-Box Warning probative evidence that Dr. Johnstone's general causation opinion is reliable.

At trial and in his deposition testimony, Dr. Elliott criticized the FDA's 2004 Study and Black-Box Warning, as well as Dr. Johnstone's

general causation opinion, because, while Dr. Elliott acknowledges that SSRIs increase the risk of adolescent suicidality, he contends that they decrease the risk of completed suicide. Def.'s Resp. to Pl.'s Mot. to Exclude Dr. Elliott Ex. 5, Elliott Aff. ¶ 3, ECF No. 32-6; Elliott Dep. 52:3-54:25; *see also* Def.'s Resp. to Pl.'s Mot. to Exclude Dr. Elliott 12-14, ECF No. 32; Def.'s Proposed Findings of Fact and Conclusions of Law 19, ECF No. 90. The Court understands that these medications, under appropriate circumstances, may help certain patients who are actually clinically depressed, and thus, may reduce the risk of suicide in those patients. This proposition, however, does not refute the FDA's finding of a causal link between the ingestion of SSRIs (including Prozac) and adolescent suicidality (including suicide attempt). *See* FDA Deliberations 200. Therefore, the Court finds that it was appropriate for Dr. Johnstone to rely on the FDA's 2004 Study and Black-Box Warning in forming his opinion that Prozac is generally capable of causing adolescent suicidality.

c. EPIDEMIOLOGICAL STUDIES AND JOURNAL ARTICLES

Dr. Johnstone's general causation opinion is also supported by numerous peer-reviewed studies and journal articles that show a "generally accepted causal link between SSRIs and suicidality in pediatric and adolescent patients." Johnstone Aff. ¶ 8. Two epidemiological studies published after the 2004 FDA Study illustrate that Dr. Johnstone's opinion is well supported.

One of those studies was a nested matched case-control study which found that, among children, antidepressant treatment was associated with a significant increase in suicide attempts (the "Olfson & Marcus Study"). Trial Ex. P-23, Mark Olfson & Steven C. Marcus, *A Case-Control Study of Antidepressants and Attempted Suicide During Early Phase Treatment of Major Depressive Episodes*, 69 J. Clinical Psychiatry 425 (2008). The Olfson & Marcus Study is significant because it supports the FDA's conclusion that antidepressants cause not only increased suicidal thinking but also increased suicidal behavior including, specifically, suicide attempts. *See id.* at 429.

Plaintiff also submitted an epidemiological study finding no meaningful variation in the risk of suicidal acts according to antidepressant agent within the class of antidepressants the FDA studied (the "Schneeweiss Study"). Trial Ex. P-23, Sebastian Schneeweiss *et al.*, *Comparative Study of Antidepressant Agents for Children and Adolescents Regarding Suicidal Acts*, 125 Pediatrics 876 (2010). The Schneeweiss Study is important because it affirms the FDA's decision to include all of the antidepressants it studied, including Prozac, in the Black-Box Warning.[6]

---

[6]The FDA recognized that a limitation of its 2004 study was that "the studies [it examined] were too underpowered to draw any conclusions regarding safety for specific antidepressant agents or for specific disorders." FDA Deliberations 200; *see also* Hammad Article 337 ("This study cannot provide valid comparisons of the 9 drugs studied.").

33

Together, these studies demonstrate that the FDA's more general conclusion—that SSRIs can cause increased adolescent suicidality—supports Dr. Johnstone's opinion that Prozac was generally capable of causing Jessica Ray's suicide attempt.

### d. OTHER INDICIA OF RELIABILITY

Finally, the Court finds that Dr. Johnstone's general causation opinion has several other indicia of reliability. First, at trial Dr. Johnstone generally described the physiological process by which Prozac causes adolescent suicidality. *See Hendrix*, 609 F.3d at 1197 ("An expert's opinion will likely also survive *Daubert* if the expert describes the physiological process, derived by the scientific method, by which a particular cause leads to the development of a given disease or syndrome."). Specifically, Dr. Johnstone explained that SSRIs cause increased suicidality in adolescents because they affect the level of serotonin in the synapses of the brain, leading to diminished inhibitions and impulsive behavior.[7] *See* Johnstone Aff. ¶ 24; Johnstone Dep. 106:6-107:5. Second, both Dr. Johnstone and the FDA's 2004 Study accounted for obvious alternative explanations of increased adolescent suicidality, including the background risk that depression can cause adolescent suicidality.[8] *See McClain*, 401 F.3d

---

[7]During his deposition Dr. Elliott agreed with Dr. Johnstone that SSRIs can decrease adolescents' impulse control and make them more impulsive. Elliott Dep. 49:9-50:9.

[8]"The background risk is not the risk posed by the chemical or drug at issue in the case. It is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the drug or chemical in question. The

at 1243 ("A reliable methodology should take into account the background risk."); Fed. R. Evid. 702 advisory committee notes (2000 amends.) (noting that, in determining the reliability of an expert's opinion, courts consider "[w]hether the expert has adequately accounted for obvious alternative explanations"). For example, Dr. Johnstone recognized that depression alone can cause adolescent suicidality. Johnstone Aff. ¶ 18. The FDA's 2004 Study was based on placebo-controlled pediatric trials of SSRIs. Posner Article at 1035. The study specifically investigated and excluded alternative explanations of the increased adolescent suicidality. Hammad Article at 334 (stating FDA investigated variables well known to affect the risk of suicidality—age, sex, and history of suicide attempt or ideation—but that "[r]esults showed no consistent evidence suggesting that these variables affected the risk for [suicidality]"). Finally, there is evidence that Dr. Johnstone "is being as careful as he would be in his regular professional work outside his paid litigation consulting." Fed. R. Evid. 702, advisory committee's notes (2000 amends.). Dr. Johnstone testified that although he previously prescribed Prozac frequently in his clinical practice, he now rarely prescribes it because of his concerns regarding its safety. Johnstone Aff. ¶ 3.

---

background risks include all those causes of a disease, whether known or unknown, excluding the drug or chemical in question." *McClain*, 401 F.3d at 1243.

For all of the foregoing reasons, the Court finds Dr. Johnstone relied on a sufficiently reliable methodology in forming his general causation opinion. The Court will, therefore, now determine whether Dr. Johnstone's method of determining specific causation was sufficiently reliable.

    2.   *Dr. Johnstone's Specific Causation Opinion is Reliable*

With regard to specific causation, Dr. Johnstone testified that Jessica Ray's ingestion of Prozac caused or contributed to cause her suicide attempt, to a reasonable degree of medical certainty. Johnstone Aff. ¶ 12. In forming his specific causation opinion, Dr. Johnstone reviewed medical records from MedLink Hartwell, Greenville Memorial Hospital, and Ty Cobb Memorial Hospital, as well as the depositions of Dr. Raber, Nurse Bowie, Dr. Michael Avant, Plaintiff Romona Floyd, Dennis Floyd, Anthony Ray, Corey Risner, Lisa Soenen, and Anne Bradley. Johnstone Aff. ¶ 6. Relying on that review, his familiarity with the FDA's Black-Box Warning, the relevant published literature, and his own clinical experience, Dr. Johnstone opined that Jessica Ray's Prozac ingestion was a proximate cause of her suicide attempt.

Defendant criticizes Dr. Johnstone's specific causation opinion for two reasons. First, Defendant contends that Dr. Johnstone inappropriately concluded that Prozac was the cause of Jessica Ray's suicide attempt based on the temporal proximity of her ingestion of Prozac and her suicide attempt. Second, Defendant argues that, in

36

performing his differential etiology to determine the cause of Jessica Ray's suicide attempt, Dr. Johnstone did not adequately rule out other possible causes, including: Jessica Ray's breakup with her boyfriend, her alleged "gothic" affiliations, an alleged argument with her father the morning of her suicide attempt, an alleged argument with her mother forty minutes prior to her suicide attempt, family stressors, and her alleged depression. Def.'s Mot. to Exclude 18-19; Def.'s Reply in Supp. of Def.'s Mot. to Exclude 6-9. The Court finds Defendant's arguments unpersuasive.

First, the Court finds that Dr. Johnstone adequately explained the relevance of the temporal relationship between Jessica Ray's ingestion of Prozac and her suicide attempt. The Court understands that "[t]emporal proximity is generally not a reliable indicator of a causal relationship." *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1254 (11th Cir. 2010); *McClain*, 401 F.3d at 1254 ("[P]roving a *temporal* relationship between taking Metabolife and the onset of symptoms does not establish a *causal* relationship."). "In other words, simply because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy." *McClain*, 401 F.3d at 1254. However, "temporal proximity may constitute probative evidence in certain circumstances." *Guinn*, 602 F.3d at 1254. For example, "depending on the circumstances, a temporal relationship between exposure to a substance and the onset

of a disease or a worsening of symptoms can provide compelling evidence of causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999).

Here, Dr. Johnstone did not testify that the mere temporal proximity between Jessica Ray's ingestion of Prozac and her suicide attempt, standing alone, was the basis of his specific causation opinion. *See McClain*, 401 F.3d at 1254 ("[T]he temporal connection between exposure to chemicals and an onset of symptoms, *standing alone*, is entitled to little weight in determining causation.") (internal quotation marks omitted) (emphasis added); *accord Kilpatrick*, 613 F.3d at 1342. Instead, Dr. Johnstone explained that the time period of Jessica Ray's suicide attempt was especially probative in this case since it "places her suicide attempt squarely within the window of time during which increased suicidality has been shown to exist - within the first several weeks of treatment or change in dose."[9] Johnstone Aff. ¶ 17; *see also* PDR at 1772 (warning of a "greater risk of adverse events representing suicidal thinking or behavior (suicidality) during the first few months of treatment"). Under these circumstances, the Court concludes that the temporal relationship between Jessica Ray's ingestion of Prozac and her suicide

---

[9]Dr. Elliott agreed that Jessica Ray's suicide attempt occurred within the time frame in which the general psychiatric community recognizes that there is an increased risk of suicidal ideations and suicidal behavior in adolescents. Elliott Dep. 77:20-78:2.

attempt provides support for Dr. Johnstone's opinion that Prozac caused or contributed to cause her suicide attempt.

It is also clear that Dr. Johnstone sufficiently considered other possible causes of Jessica Ray's suicide attempt and ruled them out. As the Eleventh Circuit explained in *Guinn*, "a reliable differential [etiology] need not rule out all possible alternative causes, [but] it must at least consider other factors that could have been the sole cause of plaintiff's injury." *Guinn*, F.3d at 1253. The expert "must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause of the plaintiff's injury." *Id.* (alteration in original) (internal quotation marks omitted). Despite Defendant's contention to the contrary, the Court finds that Dr. Johnstone considered and ruled out each alternative cause Defendant suggested. Johnstone Aff. ¶¶ 17-32. First, Dr. Johnstone easily excluded Jessica Ray's alleged "gothic" affiliations as an alternative cause of her suicide attempt because he, like this Court, found no evidence that she was involved in any such "gothic" groups. *Id.* ¶ 21. Dr. Johnstone likewise dismissed any underlying depression or psychological disorder as an alternative cause of Jessica Ray's suicide attempt because Dr. Johnstone, again like this Court, found that Jessica Ray exhibited neither a history of any psychological disorders nor any objective symptoms of depression. *Id.* ¶¶ 13-14, 17-18. Dr. Johnstone further eliminated any argument with her parents as a cause of Jessica Ray's

suicide attempt because none of Jessica Ray's prior arguments with her parents drove her to attempt suicide. *Id.* ¶ 31.

Dr. Johnstone acknowledged that family stressors and her romantic breakup may have played some role in Jessica Ray's suicide attempt; however, Dr. Johnstone also provided a reasonable explanation why neither was the sole cause of Jessica Ray's suicide attempt. *See id.* ¶ 32. Dr. Johnstone reasoned that Jessica Ray's family stressors would not have caused her suicide attempt in the absence of Prozac because Jessica Ray had lived with her parents' divorce and her father's alcoholism for approximately ten years without ever harming herself. *Id.* ¶ 31. Dr. Johnstone also found that Jessica Ray's break-up with her boyfriend, standing alone, was not sufficient to cause her suicide attempt because, among other things, Jessica Ray and her former boyfriend were discussing reconciliation. *Id.* ¶ 31. Further, Dr. Johnstone opined that the unusually violent and impulsive nature of Jessica Ray's suicide attempt led him to conclude that "while Jessica Ray did have family and romantic stressors that may have contributed to her suicide attempt, the [Prozac] was the factor that pushed her to abandon her inhibitions and act upon impulse." *Id.* ¶¶ 22, 30, 32. Despite ample opportunity to cross-examine Dr. Johnstone about each of these explanations, Defendant has not convinced the Court that Dr. Johnstone unreasonably excluded any alternative cause of Jessica Ray's suicide attempt. Therefore, the

Court finds that Dr. Johnstone used a reliable methodology to form his specific causation opinion.

For the foregoing reasons, the Court concludes that Dr. Johnstone used a reliable differential etiology methodology in arriving at his opinion that Jessica Ray's ingestion of Prozac caused her suicide attempt. As discussed above, Dr. Johnstone included Prozac as a cause of Jessica Ray's suicide attempt, concluding that it is generally capable of causing suicidality in adolescents. Dr. Johnstone then ruled out other possible causes based on his review of Jessica Ray's medical records and the relevant depositions, his familiarity with the FDA's Black-Box Warning, his study of the relevant published literature, and his own clinical experience. The exclusion of potential alternative causes, along with the unusually violent and impulsive nature of Jessica Ray's suicide attempt, led Dr. Johnstone to opine that the cause of Jessica Ray's suicide attempt was her ingestion of Prozac. Based on the foregoing, the Court finds that the testimony of Dr. Johnstone makes it through the Rule 702 gate. Therefore, Defendant's Motion to Exclude the Testimony of Dr. Edwin Johnstone (ECF No. 25) is denied.

## II. Plaintiff's Motion to Exclude Dr. Elliott

Defendant offered the testimony of Dr. Elliott to rebut Dr. Johnstone's opinion regarding the cause of Jessica Ray's suicide attempt. Dr. Elliott opined that it cannot be stated to a reasonable degree of medical certainty that Jessica Ray's ingestion of Prozac

caused her suicide attempt. Pl.'s Mot. to Exclude Testimony of Richard Elliott Ex. 7, Report by Richard Elliott, MD, PhD 1, ECF No. 23-8 [hereinafter Elliott Report]. The basis of his opinion is that, in general, the top two reasons why adolescents commit suicide are: (1) family discord; and (2) romantic break-ups. Elliott Dep. 102:3-103:11, 109:5-110:16; Elliott Report 1; Elliot Aff. ¶ 4. Dr. Elliott concluded that because Jessica Ray had recently experienced both of these stressors, there is no need to look to Prozac to explain her suicide attempt. Elliott Dep. 102:3-103:11, 109:5-110:16; Elliot Report 1. Dr. Elliott also testified that he does not believe Prozac caused Jessica Ray's suicide attempt because there is no evidence Jessica Ray experienced akathisia (jitteriness), which would indicate she was "activated." Elliott Dep. 110:17-22.

Plaintiff challenges the reliability of Dr. Elliott's causation opinion. Pl.'s Mot. to Exclude 9. The Court, however, finds that it need not rule on Plaintiff's *Daubert* motion because, even after fully considering Dr. Elliott's causation opinion, the Court as factfinder in this case nevertheless finds in favor of Plaintiff. Therefore, in light of the Court's other findings of fact and conclusions of law, Plaintiff's Motion to Exclude the Testimony of Richard Elliott, M.D., Ph.D. (ECF No. 23) is denied as moot.

### III. Summary Regarding Expert Testimony

The Court finds the testimony of Dr. Johnstone both admissible and persuasive. Based on that testimony and other evidence admitted

at trial, the Court finds, as indicated in its findings of fact, that Jessica Ray's ingestion of Prozac was a substantial contributing cause of her hanging herself with her belt.

8.

As noted in its findings of fact, the Court, when evaluating the credibility of the testimony of Nurse Bowie and Dr. Raber, took into consideration their refusal to answer certain significant questions during their testimony at trial. If a witness refuses to answer a question during trial by invoking his or her constitutional right under the Fifth Amendment, the factfinder may draw an inference that the response to the question would have been adverse to the witness who refuses to answer.[10] *Pyles v. Johnson*, 136 F.3d 986, 997 (5th Cir. 1998); *Cf. Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("[I]n a civil suit . . . the court may draw adverse inferences against a party that invokes the Fifth Amendment."); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"). Nurse Bowie and Dr.

---

[10]While it is clear that the factfinder in a civil case may draw adverse inferences against *a party* that invokes the Fifth Amendment, *Eagle Hosp. Physicians, LLC*, 561 F.3d at 1304, the Eleventh Circuit Court of Appeals has not specifically addressed whether such a factfinder may draw adverse inferences against *a non-party witness* who invokes the Fifth Amendment. The Court finds that such an adverse inference is appropriate regarding the testimony of Nurse Bowie and Dr. Raber, particularly because it is their conduct that is being imputed to Defendant to determine Defendant's liability in this case.

Raber invoked the Fifth Amendment in response to questions regarding the subject matter that is at the heart of this litigation: Nurse Bowie's prescription of Prozac to Jessica Ray. Therefore, the Court may draw adverse inferences from their invocation of the Fifth Amendment. Any unfair prejudice from the Court's consideration of their invocation of the Fifth Amendment is substantially outweighed by probative value. *See* Fed. R. Evid. 403; *see also Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (conducting Rule 403 analysis after concluding that no constitutional mandate barred an adverse inference from a non-party witness's invocation of the Fifth Amendment).

9.

"[T]he components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred . . . ." *Bravo v. United States*, 532 F.3d 1154, 1160-61 (11th Cir. 2008) (internal quotation marks omitted) (alterations in original). The Court applied the following principles of Georgia law in making its damages awards in this case.

Plaintiff, in her capacity as Administratrix of the Estate of Jessica Ray, is entitled to recover for the funeral, medical, and other necessary expenses resulting from the injury and death of Jessica Ray. O.C.G.A. § 51-4-5(b). As Administratrix, she is also entitled to recover for Jessica Ray's pain and suffering from the date of her injury to the date of her death. *Blackstone v. Blackstone*, 282

Ga. App. 515, 518 n.5, 639 S.E.2d 369, 372 n.5 (2006); *see also* O.C.G.A. § 9-2-41 (providing for survival action).

Under Georgia law, pain and suffering damages are measured by the enlightened conscience of a fair and impartial factfinder. *Hart v. Shergold*, 295 Ga. App. 94, 99, 670 S.E.2d 895, 899 (2008). "'There exists no rule or yardstick against which damages for pain and suffering are to be measured[.]'" *AT Sys. Se., Inc. v. Carnes*, 272 Ga. App. 671, 672, 613 S.E.2d 150, 152 (2005) (quoting *Smith v. Crump*, 223 Ga. App. 52, 57, 476 S.E.2d 817, 821 (1996)).

In addition to damages that are recoverable as Administratrix of the Estate, Plaintiff, as surviving mother of Jessica Ray, is entitled to recover the full value of Jessica Ray's life without deducting for any of Jessica Ray's necessary or personal expenses had she lived. O.C.G.A. §§ 51-4-1(1), 51-4-4, 19-7-1(c). "[U]nder Georgia's wrongful death statute, damages are measured from the decedent's point of view." *Brock v. Wedincamp*, 253 Ga. App. 275, 280, 558 S.E.2d 836, 841 (2002). The full value of Jessica Ray's life is comprised of two categories of damages:

> (1) those items having a proven monetary value, such as lost potential lifetime earnings, income, or services, reduced to present cash value . . . or
>
> (2) lost intangible items whose value cannot be precisely quantified, such as a parent's society, advice, example and counsel as determined by the enlightened conscience of the [factfinder].

*Consol. Freightways Corp. of Del. v. Futrell*, 201 Ga. App. 233, 233, 410 S.E.2d 751, 752 (1991) (internal quotation marks and citations

omitted); *accord Miller v. Jenkins*, 201 Ga. App. 825, 826, 412 S.E.2d
555, 556 (1991) ("The 'full value of the life of the decedent'
consists of two elements, the economic value of the deceased's normal
life expectancy and the intangible element incapable of exact
proof."). "[T]he trial court has considerable latitude in applying
these components to the facts of a particular case in determining the
full value of a decedent's life." *Whitley v. United States*, 170 F.3d
1061, 1080 (11th Cir. 1999) (applying Georgia law); *see also Brock*,
253 Ga. App. at 280, 558 S.E.2d at 841 ("The intangible factors that
supplement the economic value to comprise the 'full value of the
decedent's life' elude precise definition.") (internal quotation marks
omitted).

"The value of a child's life must be established by the
enlightened conscience of an impartial [factfinder] as applied to the
evidence in the case, including testimony as to such child's age, life
expectancy, precocity, health, mental and physical development, family
circumstances, and from the experience and knowledge of human affairs
on the part of the [factfinder]." *Dep't of Human Res. v. Johnson*, 264
Ga. App. 730, 738, 592 S.E.2d 124, 131 (2003).

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law,
the Court directs the Clerk to enter judgment as follows: (1) in favor
of Plaintiff Romona L. Floyd, as Administratrix of the Estate of
Jessica Ann Ray, and against Defendant, the United States of America,

in the total amount of $678,208.00; and (2) in favor of Plaintiff Romona L. Floyd, as the surviving parent of Jessica Ann Ray, and against Defendant, the United States of America, in the total amount of $2,781,684.20.  Plaintiff shall also recover her costs incurred in this action.

IT IS SO ORDERED, this 26th day of November, 2010.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE